David S. Catuogno, Esq.
K&L Gates LLP
One Newark Center
1085 Raymond Boulevard, 10th Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Email: david.catuogno@klgates.com

*Counsel to Wyndham Hotel Group, LLC*
*TMH Worldwide, LLC, Travelodge Hotels,*
*Inc., and Baymont Franchise Systems, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LUXURBAN HOTELS INC., *et al.*,[1] | Case No. 25-12000 (DSJ) |
| Debtors. | (Jointly Administered) |

**JOINDER OF WYNDHAM HOTEL GROUP, LLC, TMH WORLDWIDE,**
**LLC, TRAVELODGE HOTELS, INC., AND BAYMONT FRANCHISE SYSTEMS,**
**INC.'S TO MOTION OF THE OFFICE OF THE UNITED STATES TRUSTEE**
**FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

Wyndham Hotel Group, LLC ("WHG"), TMH Worldwide, LLC ("TMH"), Travelodge Hotels, Inc. ("THI"), and Baymont Franchise Systems, Inc., ("BFS" and, together with WHG, TMH, and THI, the "Wyndham Entities"), by and through their undersigned counsel, respectfully submit this joinder (the "Joinder") in the motion filed by the Office of the United States Trustee ("OUST") for the appointment of a Chapter 11 Trustee (the "Trustee Motion") (ECF No. 70) for the debtors LuxUrban Hotels, Inc. ("LuxUrban Hotels") and LuxUrban RE Holdings ("LuxUrban RE" and, together with LuxUrban Hotels, the "Debtors") herein.

**JURISDICTION AND VENUE**

1.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: LuxUrban Hotels Inc. (4945); and LuxUrban RE Holdings LLC (2907).

matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

A.    The Marks and Systems.

2.    The Wyndham Entities do not own or operate any hotels. Instead, certain of the Wyndham Entities, specifically, TMH, THI, and BFS (the "Wyndham Licensing Entities") operate guest-lodging facility franchise systems [2]. The systems, broadly stated, are comprised of various trade names and service marks (which are on the principal register of the United States Patent and Trademark Office), logos and derivations thereof.

3.    The Wyndham Licensing Entities have the exclusive right to use and license certain trade names, trademarks, and service marks, which have been registered on the Principal Register of the United States Patent and Trademark Office, with other appropriate state agencies in the United States, and with governmental agencies of foreign countries. These marks, together with certain other trademarks and service marks which are not registered, or which are pending registration, are hereinafter collectively referred to as the "Marks."

4.    The Wyndham Licensing Entities have developed membership or franchise systems for independently owned and/or operated guest lodging facilities designed to enable such facilities to compete effectively in the hospitality market (which systems are hereinafter referred to as the "Systems"). The Systems include, but are not limited to, common use and promotion of certain Marks, copyrights, trade secrets, centralized advertising programs, referral programs and centralized support functions such as a nationwide computer reservation system. The Wyndham Licensing Entities, from time to time, revise and update the Systems.

---

[2] The Wyndham Licensing Entities are subsidiaries of WHG.

5.      The Wyndham Licensing Entities or their predecessors have continuously used each of their respective Marks since the date of their registration and those service marks are in full force and effect pursuant to 15 U.S.C. § 1065. The Wyndham Licensing Entities have each given notice to the public of the registration of each of their respective Marks as provided in 15 U.S.C. § 1111, and the Wyndham Licensing Entities use or have used the Marks as abbreviations of their brand name.

6.      The hotels operating as part of the respective membership or franchise systems are all independently owned and operated. The Wyndham Licensing Entities allow their members or franchisees, pursuant to individual license, membership, or franchise agreements, to operate their hotels as guest-lodging facilities utilizing the Marks and Systems. Through their franchise systems, the Wyndham Licensing Entities market, promote, and provide services to their respective members and franchisees throughout the United States. To identify the origin of their services, the Wyndham Licensing Entities allow their members and franchisees to utilize the Marks and to otherwise associate their facilities services with the respective brands.

7.      The Wyndham Licensing Entities have invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in the Marks as distinctly designating the high-quality guest lodging services provided by members and franchisees. The Marks are indisputably famous trademarks in the United States.

**B.      <u>The Hotel Agreements.</u>**

8.      Prior to the Petition Date, the Debtors entered into various franchise or membership agreements [3] and related agreements with TMH, THI, BFS and WHG relative to the Debtors' guest lodging facilities. Generally, the Franchise/Membership Agreements granted the Debtors a license to

---

[3] The TMH Membership Agreements, the Baymont Franchise Agreement, and the Travelodge Franchise Agreement are referred to collectively herein as the "<u>Franchise/Membership Agreements</u>" and together with the related agreements between the Debtors and the Wyndham Entities, the "<u>Hotel Agreements</u>."

1603236651.1

operate the identified hotels (collectively, the "LuxUrban Hotel Properties") under the systems

offered by the Wyndham Licensing Entities and to use trademarks and other intellectual property of

the Wyndham Licensing Entities at the LuxUrban Hotel Properties. The related agreements provided

for other services and obligations incident to the Debtors' conduct of their hotel operations.

9.     The Hotel Agreements can be summarized as follows:[4]

| HOTEL PROPERTY | DATE | AGREEMENT | DEBTOR PARTY | WYNDHAM ENTITY |
|---|---|---|---|---|
| **150 20th Street, Miami Beach, Florida 33139, designated as Site No. 56360- 24053-02 (the "Townhouse Hotel")** | August 2, 2023 | Hotel Membership Agreement | LuxUrban | TMH |
| | | Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **819 Flower Street, Los Angeles, California 90017, designated as Site No. 58331- 24059-01 (the "O Hotel")** | August 2, 2023 | O Hotel Membership Agreement | LuxUrban RE | TMH |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | TMH |
| **136 West 55th Street, New York, New York 10019, designated as Site No. 58347-24053-01 (the "Blakely Hotel")** | August 2, 2023 | Blakely Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **56 Franklin Avenue, Brooklyn, New York 11205, designated as Site No. 58346- 24059-01 (the "Condor Hotel")** | August 2, 2023 | Condor Hotel Membership Agreement | LuxUrban RE | TMH |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | TMH |

---

[4] A more detailed summary of the Hotel Agreements is set forth in the Verified Complaint filed by the Wyndham Entities in the State Court Action, defined, *infra*.

| | | | | |
|---|---|---|---|---|
| **8 Albany Street, New York, New York 10006, designated as Site No. 58349- 24053-01 (the "<u>Washington Hotel</u>")** | August 2, 2023 | Washington Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **960 Avenue of the Americas, New York, New York 100016, designated as Site No. 58348-24053-01 (the "<u>Herald Hotel</u>").** | August 2, 2023 | Herald Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **600 Saint Andrews Avenue, New Orleans, Louisiana 70130, designated as Site No. 58330-24053-02 (the "<u>Lafayette Hotel</u>")** | August 2, 2023 | Lafayette Hotel Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **1700 Alton Road, Miami Beach, Florida 33139, designated as Site No. 58322- 24053-02 (the "<u>Variety Hotel</u>")** | August 2, 2023 | Variety Hotel Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **120 East 39th Street, New York, New York 10016, designated as Site No. 58350-24059-01 (the "<u>Tuscany Hotel</u>")** | August 2, 2023 | Tuscany Hotel Membership Agreement | LuxUrban RE | TMH |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | TMH |

| | | | | |
|---|---|---|---|---|
| **130 East 57th Street, New York, New York 10022, designated as Site No. 58351-24059-01 (the "Hotel 57")** | August 2, 2023 | Hotel 57 Membership Agreement | LuxUrban RE | TMH |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | TMH |
| **956 Washington Avenue, Miami Beach, Florida 33139, designated as Site No. 58325-24053-02 (the "Astor Hotel")** | August 2, 2023 | Astor Hotel Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **1228 Collins Avenue, Miami Beach, Florida 33139, designated as Site No. 58326-24053-02 (the "Hotel Impala")** | August 2, 2023 | Hotel Impala Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **1238 Collins Avenue, Miami Beach, Florida 33139, designated as Site No. 58324-24053-02 (the "La Flora Hotel")** | August 2, 2023 | La Flora Hotel Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **101 Bogart Street, Brooklyn, New York 11206, designated as Site No. 58328- 24059-01 (the "Bogart Hotel")** | August 2, 2023 | Bogart Hotel Membership Agreement | LuxUrban RE | TMH |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | TMH |

| | | | | |
|---|---|---|---|---|
| **1200 Ocean Drive, Miami Beach, Florida 33139, designated as Site No. 58323- 24053-02 (the "12th & Ocean Hotel")** | August 2, 2023 | 12th & Ocean Hotel Membership Agreement | LuxUrban | TMH |
| | | Signature Reservation Services Agreement | LuxUrban | WHG |
| | | Master Information Technology Agreement | LuxUrban | TMH |
| **62 Madison Avenue, New York, New York 10016, designated as Site No. 58573-24059-01 (the "Baymont Facility")** | December 6, 2023 | Franchise Agreement | LuxUrban RE | BFS |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | BFS |
| **129 West 46th Street, New York, New York 10036, designated as Site No. 58329-24059-03 (the "Hotel 46 Facility" or the "Travelodge Facility")** | December 8, 2023 | Hotel 46 Agreement | LuxUrban RE | THI |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | THI |
| **44 West 44th Street, New York, New York 10036, designated as Site No. 58647-24059-02 (the "Royalton Hotel")** | December 27, 2023 | Royalton Hotel Membership Agreement | LuxUrban RE | TMH |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | TMH |
| **22 East 29th Street, New York, New York 10016-7406, designated as Site No. 58621-24059-02 (the "James Hotel")[5]** | February 7, 2024 | James Hotel Membership Agreement | LuxUrban RE | TMH |
| | | Signature Reservation Services Agreement | LuxUrban RE | WHG |
| | | Master Information Technology Agreement | LuxUrban RE | TMH |

---

[5] The Townhouse Hotel, O Hotel, Blakely, Condor Hotel, Washington, Herald, Lafayette, Variety Hotel, Tuscany Hotel, Hotel 57, James Hotel, Royalton Hotel, Astor Hotel, Hotel Impala, La Flora Hotel, Bogart Hotel, and the 12th & Ocean Hotel are referred to collectively herein as the "Trademark Hotels".

1603236651.1

10.     As a general matter, the Franchise/Membership Agreements each obligated the respective Debtor to, *inter alia*, (i) operate the applicable hotel facility for a defined term of years; (ii)  operate the applicable hotel facility continuously after the respective Opening Dates[6] on a year-round basis; (iii) make certain periodic payments for membership fees, marketing fees, MITA fees, SRS fees, taxes, interest, and other fees (collectively, "Recurring Fees"): (iv) prepare and submit monthly reports disclosing, among other things, monthly gross room revenue; (v) maintain accurate financial information, including books, records, and accounts and allow the applicable Franchisor to examine and audit same; (vi)  not permit or allow [their] officers, directors, principals, employees…to engage in conduct which is unlawful or damaging to the good will or public image of the applicable franchise system; (vii) maintain minimum insurance coverage; and (viii)  refrain from issuing any press releases or making any other public-facing statements about any agreements between the Debtors and the applicable Wyndham Entities without prior written consent, and to ensure that no misrepresentation is made regarding the relationship between the parties.

11.     The Hotel Agreements also generally allowed the Wyndham Licensing Entities to terminate the applicable Franchise/Membership Agreement for, *inter alia*, (a) failure to pay any amount due thereunder as and when due, (b) failure to cure noticed default(s), (c) failure to pay debts as they come due in the ordinary course of business, (d) commission of an act or failure to act, that in the Wyndham Entities' reasonable judgment is or could be injurious or prejudicial to the Wyndham Entities' goodwill and/or System, (e) failure to perform Improvement obligations, (f) failure to operate the  guest lodging facility(ies), and/or (g) failure to maintain possession or the right to possession of the guest lodging facility(ies).

---

[6] All capitalized terms not defined herein are as defined in the respective agreements.

12.     The Hotel Agreements also provided for the imposition of liquidated damages against the Debtors in the event of a premature termination of any of the Franchise/Membership Agreements.

13.     In connection with entering into the Hotel Agreements the Debtors made certain Development Incentive Notes (the "DINs") in favor of the Wyndham Licensing Entities and obligated themselves for the repayment of same. Specifically, Debtor LuxUrban Hotels made and delivered DINs totaling $3,924,500 to the Wyndham Licensing Entities and Debtor LuxUrban RE made and delivered DINs totaling $5,648,250 to the Wyndham Licensing Entities.

**C.      The Defaults under the Hotel Agreements.**

14.     From the inception of the Hotel Agreements, LuxUrban and LuxUrban RE consistently engaged in conduct that was in violation of the Hotel Agreements.

15.     LuxUrban and LuxUrban RE failed to pay any Recurring Fees during their time operating the Trademark Hotels, Travelodge Facility, and Baymont Facility. LuxUrban and LuxUrban RE failed to cure these financial defaults.

16.     In addition, LuxUrban and LuxUrban RE engaged in conduct that caused harm to the goodwill associated with the Trademark Collection®, Travelodge®, and Baymont® brands. These goodwill defaults provided grounds for immediate termination of the Hotel Agreements.

17.     LuxUrban and LuxUrban RE also failed to obtain or maintain possession of some of the Trademark Hotels and the Travelodge Facility, and made public statements, without the approval of TMH or WHG, misrepresenting the relationship between LuxUrban and LuxUrban RE and TMH or WHG. These were incurable defaults under the Hotel Agreements.

1603236651.1

**D.**      **The Termination of the Hotel Agreements**

18.      Prior to the Petition Date (defined, *infra*), each and every one of the Hotel Agreements for each and every one of the LuxUrban Hotel Properties was terminated by the applicable Wyndham Entity for various reasons, including failure to pay Recurring Fees, failure to operate, failure to secure, maintain possession of, or improve the applicable hotel property(ies) as required under the Hotel Agreement(s), taking action(s) or making statements that were causing harm to the good will and public image of the applicable  brand and System, failure to use an approved payment processing solution, failure to provide proof of minimum insurance coverage, the making of public statements, without the approval of the applicable Wyndham Entity(ies) and misrepresenting the relationship between the Debtors the applicable Wyndham Entity(ies), and failure to pay debts as they became due in the ordinary course of business.

19.      As a result of the termination of the Hotel Agreements, as of the Petition Date, the total amount of outstanding Recurring Fees, DIN Obligations and Liquidated Damages due and owing to the Wyndham Entities from the Debtors is not less than $17,501,301.80 (the "Pre-petition Indebtedness").  Substantially contemporaneous with this Joinder, TMH, THI and BFS have filed or will be filing proofs of claim for the portions of the Pre-petition Indebtedness due to them. WHG intends to file a proof of claim in the ordinary course.

**D.**      **The State Court Action.**

20.      On November 14, 2024, the Wyndham Entities commenced a civil lawsuit captioned *Wyndham Hotel Group, LLC, a Delaware Limited Liability Company; TMH Worldwide, LLC, a Delaware Limited Liability Company; Travelodge Hotels, Inc., a Delaware Corporation; and Baymont Franchise Systems, Inc., a Delaware Corporation vs. LuxUrban Hotels Inc., a Delaware Corporation; LuxUrban Re Holdings LLC, a Delaware Limited Liability Company;*

1603236651.1

*Corphousing RSL LLC, a Delaware Limited Liability Company; and Brian Ferdinand, an individual* in the Superior Court of New Jersey, Docket No. MRS-L-000977-24 (the "State Court Action") against the Debtors, among others. The State Court Action seeks damages for unfulfilled monetary obligations under the Hotel Agreements. A copy of the Amended Complaint in the State Court Action (the "Amended Complaint") is attached hereto. [7]

21.     The State Court Action not only asserts claims against the Debtors, but it also asserts claims against two non-debtor parties who are insiders; specifically, Corphousing RSL LLC and Brian Ferdinand. Mr. Ferdinand is, or at least was, a principal and officer of the Debtors.

22.     As alluded to above and as set forth in the Amended Complaint Debtors "engaged in conduct that caused harm to the good will associated with the Trademark Collection®, Travelodge®, and Baymont® brands. LuxUrban's conduct has been the subject of multiple public lawsuits, evictions, and a litany of customer complaints, many of which are specifically related to Debtors improperly charging guests' credit cards and retaining guests' advance deposits long after a reservation was successfully cancelled." [8] See Amended Complaint at ¶ 210.

---

[7] The Wyndham Entities intend to file a Motion for Relief from the Automatic Stay to continue prosecution of the State Court Action prior to the time the Trustee Motion comes on for hearing. That Motion will be submitted along with a declaration that will provide factual support therefor, and further factual support for this Joinder.

[8] By way of example, LuxUrban was sued for violating federal securities laws because it misstated and/or failed to disclose to investors: (1) that the Company had not signed a lease with the Royalton Hotel; (2) that, as a result, LuxUrban's total reported units was overstated; (3) that LuxUrban faced multiple lawsuits for unpaid rent; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. *Pack v. LuxUrban Hotels Inc.*, 24 Civ. 1030 (PAE), (S.D.N.Y. Feb. 13, 2024). Additionally, on or about March 18, 2024, Debtors agreed to a fine of $1.2 million resulting from an action by the City of New York against Debtors for operating short-term rentals. Also, a federal district court entered default judgment against LuxUrban for approximately $120,000. See Brown v. LuxUrban Hotels, Inc., 2024 WL 761852, at *2-3 (E.D. Va. Feb. 23, 2024). Default judgment and a writ of garnishment was also entered against LuxUrban in at least one other case, see, e.g., 1238 Collins Ave. Corp. v. LuxUrban Hotels, Inc., Case No. 2024-002471-CA-01 (Fla. Cir. Ct.), and there are other pending actions against LuxUrban for failure to pay amounts owed under rental agreements and violations of lease provisions, see, e.g., Apple Eight Hospitality Ownership v. LuxUrban Re Holdings LLC, Index No. Unassigned (N.Y. Sup. Ct.). This list is a sampling of the myriad lawsuits where Debtors have been, or currently are, a named defendant.

1603236651.1

23.     Per the Amended Complaint, the Debtors also made public statements, without the approval of TMH or WHG, misrepresenting the relationship between Debtors and TMH or WHG.[9] See Amended Complaint at ¶ 211.

24.     The Amended Complaint, further notes that on April 15, 2024, Grassi & Co., CPAs, P.C., an independent registered accounting firm, opined that LuxUrban's significant accumulated operating losses and working capital deficit raise substantial doubt about its ability to continue as a going concern.[10]  See Amended Complaint at ¶ 212.

**E.      The Bankruptcy Filing and the Debtor's Inability to Operate.**

25.     On September 14, 2025 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing these chapter 11 cases (the "Chapter 11 Cases"). The Chapter 11 Cases are procedurally consolidated and jointly administered pursuant to Order for Joint Administration dated September 16, 2025 (ECF No. 3). As of yet, no trustee, examiner, or creditors' committee has been appointed in the Chapter 11 Cases.

26.     Upon information and belief, the Debtors remain in possession of their property and continue to manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, albeit the Debtors have represented to the Court that they presently have no funds and are conducting no active operations.

27.     More specifically, at the status conference held by the Court in the Chapter 11 Cases on Tuesday, September 30, 2025, Debtors' counsel advised the Court that the Debtors are not

---

[9] For example, LuxUrban issued a press release on September 1, 2023, without the consent of TMH or WHG, which mischaracterized the development incentives under the Hotel Agreements.

[10] LuxUrban Hotels Inc. (2023). *Form 10-K*. https://investor.luxurbanhotels.com/financials/sec-filings/sec-filingsdetails/default.aspx?FilingId=17448466

currently operating any of the hotels, that the Debtors had no money and could not pay their obligations, including their obligation to pay hotel employees, who "walked off the job" prior to the commencement of the Chapter 11 Cases due to the fact that they were not being paid, had not been paid for an extended time and that the Debtor's were seriously delinquent in their payment of benefit obligations on behalf of their union employees.[11] Debtors' counsel further advised the Court that it was Debtors' understanding that, as of the status conference, the hotel properties were being secured by their respective landlords without any participation or involvement of the Debtors.

28.    At that same status conference, counsel for the Debtors discussed the concept of the Debtors seeking some form of debtor-in-possession funding in order to resume operations but offered no details regarding any concrete proposals or possibilities for funding or the amounts that would be necessary to resume operations, or the whether it was even possible to reassemble a workable employee force (as the previous employees had scattered) and resume and maintain meaningful operations.

29.    The docket is replete with motions for relief from the automatic stay and other submissions whereby various landlords of the LuxUrban Hotel Properties are seeking the ability to reclaim their properties from any interest of the Debtors due to non-payment, loss of possession, expiration, or other cause.  See, e.g. W Reit Stay Motion (ECF No. 7 – Granted on October 9, 2025 (ECF No. 68); Emergent request for Stipulation and comfort Order by Aereal Capital Corporation(ECF No. 25); and St. Giles Stay Motion (ECF No. 58).  Accordingly, even if the

---

[11] See, Transcript regarding Hearing Held on 09/30/25 at 10:00 A.M. ECF No. 61. Per the docket, copies of the Transcript are presently restricted, albeit the Wyndham Entities suggest that the Court may take judicial notice of the general representations made by Debtors' counsel.

Debtor had funds within which to operate, it is less than clear whether it could secure and maintain possession of the various hotel properties underlying its theoretical resumed "operations."

30.     Additionally, in response to the Motion for relief from the automatic stay filed by W Financial REIT, Ltd (ECF No. 7) the Debtors filed an Objection (ECF No. 56) stating that "[d]ue to circumstances beyond Debtors' control, LuxUrban RE did not receive the income it was supposed to have received for the operation of this hotel, those proceeds were either not paid or were diverted." *See*, ¶ 3.  The Debtors do not provide any explanation as to the specifics or the circumstances of the diversion, but plainly admit that they did not receive income they were otherwise supposed to receive.

## I.     LEGAL ARGUMENT

### A.  This Case Requires the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104.

31.     The presumption in favor of allowing debtors to remain in possession and control of their own affairs vanishes completely when management does not comply with its fiduciary duties of care and loyalty. See Commodity Futures Trading Comm'n v. Weintraub, 105 S. Ct. 1986, 1994 (1985)

32.     Bankruptcy Code section 1104(a) provides that, on the request of a party in interest and after notice and a hearing, the UST **shall** appoint a chapter 11 trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

1603236651.1

11 U.S.C. § 1104(a)(1), (2)(emphasis added).

33.    Section 1104(a) requires the appointment of a trustee when the movant proves "cause" or that the appointment is in the "interests of creditors." In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1988); Escoe v. Zerbst, 295 U.S. 490, 493 (1935) ("shall" is the language of command, and its use in a statute indicates congressional intent that the statute be mandatory). Importantly, Section 1104(a) of the Bankruptcy Code is written in the disjunctive, which means proof of any one of the elements is sufficient to satisfy the requirement. See In re Hardesty, 190 B.R. 653, 655 (Bankr. D. Kan. 1995).

34.    Whether a chapter 11 trustee should be appointed is a fact intensive inquiry that must be analyzed on a case-by-case basis. In re Marvel Entertainment Group, Inc., 140 F.3d 463, 472 (3d Cir. 1998); In re Sharon Steel Corp., 871 F.2d at 1228 (3d Cir. 1989) (decisions under both provisions of section 1104(a) are made on a case-by-case basis and the court should consider the "totality of the circumstances"). The moving party has the burden of demonstrating the need for a chapter 11 trustee. In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990). Many courts require the moving party to establish cause by "clear and convincing evidence" while other courts require only a showing of cause by a "preponderance if the evidence".[12] In re Marvel Entertainment Group, Inc., 140 F.3d at 471.

35.    The list of articulated causes in subsection (a)(1) is not a finite list as "courts have articulated additional factors for determining the existence of cause." 7 COLLIER ON BANKRUPTCY ¶ 1104.04(3)(c)(i) (Alan N. Resnick & Henry J. Somner, eds., 2018). Subsection (a)(2) emphasizes the court's discretion, allowing it to appoint a trustee when to do so would serve the parties and estate's interests in circumstances where one of the enumerated causes of subsection

---

[12] The First Circuit lowered the standard of proof for the appointment of a chapter 11 trustee, requiring only a showing by a "preponderance if the evidence". *Tradex Corp. v. Morse*, 339 B.R. 823 (D. Mass., 2006).

1603236651.1

(a)(1) has not be established. *See In re Sharon Steel*, 86 B.R.455, 457 (Bankr. W.D. Pa. 1988); see also 7 COLLIER ON BANKRUPTCY ¶ 1104.01- 02; <u>see also</u> <u>In re Okla. Ref. C</u>o., 838 F. 2d at 1135 ("[t]he court need not find any of the enumerated wrongs in order to find cause for the appointing of a trustee. . . . It is sufficient that the appointment be in the interest of creditors.") (citing <u>In re William H. Vaughn & Co.</u>, 40 B.R. 524 (Bankr. E.D. Pa. 1984)); <u>In re Ionosphere Clubs, Inc.</u>, 113 B.R. at 168 (a court should consider practical realities such as the trustworthiness of the debtor; past and present performance; prospects for rehabilitation; the confidence, or lack thereof, of the business community and of creditors in present management; and the benefits derived by the appointment of a trustee, balanced against the cost of the appointment).

36.     Here, as will be demonstrated below, there is both actual "cause" justifying the appointment of a chapter 11 Trustee, and such appointment would be in the best interests of creditors. Since establishing either one of these elements would require the appointment of a chapter 11 trustee, the Wyndham Entities respectfully submit that the Trustee Motion should be granted.

### i.     *There is Sufficient Cause for the Appointment of a Chapter 11 Trustee in this Case.*

37.     Under the first prong of Section 1104(a), a chapter 11 trustee shall be appointed "for cause, including fraud, dishonesty, incompetence <u>or</u> gross mismanagement." 11 U.S.C. §1104 (a)(1) (emphasis added). In determining whether to appoint a chapter 11 trustee "it isn't necessary to carefully delineate whether the 'cause' consists of fraud or dishonesty as opposed to incompetence or gross mismanagement. Obviously, the result is the same since the finding of any one of these causes <u>mandates</u> [the appointment of a trustee]." <u>In re St. Louis Globe-Democrat, Inc.</u>, 63 B.R. 131, 138 (Bankr. E.D. Mo. 1985) (emphasis added).

38.     Moreover, Section 1104(a)(1) is not meant to contain an exhaustive list of causes. <u>Marvel Entertainment Group, Inc.</u>, 140 F.3d at 472. While the Wyndham Entities contend that

16

incompetence and/or gross mismanagement are present, a number of other factors also may be considered. These additional factors include "the overall management of the debtor, both past and present; the trustworthiness of the debtor's management; . . . the ability of management to act as a fiduciary of the estate; and pragmatic considerations such as cost." Rivermeadows Associates, Ltd., 185 B.R. 615, 617 (Bankr. D. Wyo. 1995); see also In re Microwave Products of America Inc., 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989) (the Bankruptcy Court must look at the debtor's pre-petition as well as post-petition conduct in determining the necessity for a trustee).

39.     In addition, in conducting its analysis under Section 1104(a), it is appropriate for this Court to examine the Debtor's pre and post-petition operations. See In re Microwave Products of America Inc., 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989) (the Bankruptcy Court must look at the debtor's pre-petition as well as post-petition conduct in determining the necessity for a trustee). In undertaking this analysis, courts are not limited to reviewing management's post-bankruptcy conduct and may consider prepetition activity. In re Ancona, 2016 Bankr. LEXIS 4114, at *32 (Bankr. S.D.N.Y. Nov. 30, 2016) ("A court may consider both pre-and post-petition misconduct of the current management when making the determination of whether 'cause' exists under section 1104(a)(1)."); In re Golden Park Estates, LLC, 2015 Bankr. LEXIS 1912, at *12 (Bankr. D.N.M. June 11, 2015).

40.     Examples of "cause" sufficient to require the appointment of a chapter 11 trustee in this case are numerous – a finding of any one of the following examples is sufficient to grant the Trustee Motion. For instance, the Debtor's gross mismanagement is evident from its undisputed failure to secure and maintain possession of its hotel properties, or pay the salary and benefit obligations of its employees causing them to walk off the job, and leaving, at least initially, multiple properties (and guests) vulnerable and less than secure. There is also the admission of the

1603236651.1

Debtors that funds it was due to receive were "diverted" away from the Debtor. These failures jeopardized, and ultimately resulted, in the loss of Debtors' sole source of income. The loss of income has resulted in Debtor entities that are devoid of cash, with no indication of any realistic potential for financing. The Debtors' current cashless and non-operating state is the result of gross mismanagement.

41.     There are also indications that Debtors failed to produce proof of adequate insurance, which was an event of default under the applicable Hotel Agreements. To the extent the failure to provide proof was due to an actual failure of insurance same would alone constitute a ground to appoint a trustee. In re Plaza de Retiro, Inc., 417 B.R. 632, 642 fn. 9 (Bankr. D.N.M. 2009); see also In re McQuillen Place Co., LLC, 609 B.R. at 831 (also noting that the inability to pay insurance further proves gross mismanagement of the estate).

42.     Further, as noted above and in the Amended Complaint, over a year and a half ago, an independent registered accounting firm expressed substantial doubt about Debtors' ability to continue as a going concern opined due to significant accumulated operating losses and working capital deficits.

43.     Here, the Debtor's failures have compromised the LuxUrban Hotel Properties and crippled the Debtors' ability to generate revenue. Indeed, it is unclear what, if anything, the Debtor has done to manage its affairs and protect its assets and it is further unclear as to what the Debtor could possibly do going forward given the acknowledged lack of funds. Based on this record, there is no other possible conclusion than the fact that the Debtor has grossly mismanaged its affairs.

44.     Additionally, as outlined in the Amended Complaint there are numerous indications of potential fraud and dishonesty that would militate in favor of appointing a Chapter 11 Trustee, including numerous customer complaints alleging improper credit card charges and/or the

wrongful prolonged retention of advance deposits for cancelled reservations, as well as the making

of numerous inaccurate public statements misrepresenting the Debtors' relationships with the

Wyndham Entities.

45.     Negative public opinion of a debtor provides persuasive evidence that a debtor is

being grossly mismanaged. In enacting 11 U.S.C. § 1104, Congress determined that public

dissatisfaction was an important factor that courts must consider in appointing a trustee. The House

Report states that "[t]he twin goals of the standard for the appointment of a trustee should be

protection of the *public interest* and the interests of creditors . . . and facilitation of a reorganization

that will benefit both the creditors and the debtors." H.R. REP. NO. 595, 95th Cong., 1st Sess. 232

(1977) (emphasis added). In In re Ionosphere Clubs, the bankruptcy court noted that when "the

debtor's business effects such a large segment of the general public, consideration of the 'public

interest' becomes a greater factor in deciding whether to order the appointment of a trustee." 113

B.R. 164, 168 (Bankr. S.D.N.Y. 1990). In its decision to appoint a trustee, the Ionosphere

bankruptcy court relied on a report filed by the Department of Transportation which stated that

discord in management could ultimately affect safety of consumers. Id. at 171.  Here the numerous

instances of consumer complaints suggest a lack of public confidence and manifest gross

mismanagement sufficient to justify the appointment of a Chapter 11 Trustee.

### ii.     *Appointment of a Trustee is in the Best Interest of Creditors.*

46.     The second prong of Section 1104(a) provides further independent basis for the

appointment of a chapter 11 trustee. Specifically, the Code recognizes the primary importance of

the creditor body and requires the appointment of a chapter 11 trustee "if such appointment is in

the interest of creditors." 11 U.S.C. §1104(a)(2). Courts have acknowledged that "creditors are the

best judge of their own best interests." *In Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 245 B.R.

794, 802 (Bankr. E.D. Pa. 2000). Here, not only has the OUST moved for the appointment of a

Chapter 11 Trustee, numerous creditors will join in the Trustee Motion and/or have indicated

support for the appointment of a Trustee, including the Wyndham Entities which, at over $17

million, are among the largest of the unsecured creditors herein. This Court is urged to defer to the

request of the OUST, as supported by the Wyndham Entities and other joining creditors.

47.     The Wyndham Entities note that in cases where conflict or acrimony exists between

the debtor in possession and its creditors, a chapter 11 trustee may be appointed. *See Marvel

Entertainment Group, Inc.*, 140 F.3d at 473 (holding that a chapter 11 trustee should be appointed

where there is "deep-seeded conflict and animosity" between the debtor and its creditors and the

creditors have no confidence in the debtor's ability to act as a fiduciary).

48.     A creditor's loss of confidence in a debtor's ability to manage and reorganize its

affairs is also grounds for the appointment of a trustee. *See Ionosphere Clubs, Inc.*, 113 B.R. at

170; *In re Cardinal Industries, Inc.*, 109 B.R. 755, 767 (Bankr. S.D. Ohio) (the court appointed a

trustee where creditors "lost faith in the Debtors' intentions and abilities to reorganize their

affairs"); *Marvel Entertainment Group, Inc.*, 140 F.3d at 474 (bickering between parties caused

creditors to lose confidence in debtor's ability to reorganize, necessitating the appointment of a

chapter 11 trustee).

49.     As illustrated above, the Debtors have already conceded that they do not have any

cash or revenue. There is no suggestion of any ability of the Debtors to operate and there are

substantial questions regarding the viability of the Debtors' ability to access and service the

properties in their prior operating footprint and resume any form of meaningful operations.

50.     Accordingly, given these circumstances, it follows that creditors would have no

confidence in the Debtors' ability to operate and/or reorganize their affairs even if they were,

1603236651.1

against all odds and reason, able to access sufficient capital to fund operations. Moreover, considering the operative facts, no reasonable party could have confidence in the Debtor's ability to resume operations and/or reorganize.

51.     The Wyndham Entities submit that this case requires a Chapter 11 Trustee, rather than the Debtors, to manage and administer the estate and bring this matter to a reasonable conclusion. Accordingly, the Wyndham Entities submit that it is necessary for the Court to appoint a Chapter 11 trustee.

## CONCLUSION

WHEREFORE, the Wyndham Entities respectfully request that this Court direct the appointment of a Chapter 11 Trustee in this case and for such other and further relief as the Court deems just and proper.

Dated: October 9, 2025          Respectfully submitted,

*/s/ David S. Catuogno*
David S. Catuogno, Esq.

K&L Gates LLP
One Newark Center, 10th Floor
1085 Raymond Boulevard
Newark, New Jersey 07102
Telephone: (973) 848-4000
Email: david.catuogno@klgates.com

*Counsel to Wyndham Hotel Group, LLC*
*TMH Worldwide, LLC, Travelodge Hotels,*
*Inc., and Baymont Franchise Systems, Inc.*